**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **MARIANA MILLER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 14 CV 9137** |
| **v.** ) | |
| ) | **Honorable Michael T. Mason** |
| **NANCY A. BERRYHILL, Acting** ) | |
| **Commissioner of Social Security** ) | |
| ) | |
| **Defendant,** ) | |

**MEMORANDUM OPINION AND ORDER**

Claimant Mariana Miller ("Miller" or "claimant") is seeking judicial review of the

final decision of the Commissioner of Social Security ("Commissioner"). The

Commissioner denied Miller's applications for supplemental security income ("SSI") and

disability insurance benefits ("DIB") under §§ 216(i), 223(d) and 1614(a)(3)(A) of the

Social Security Act ("the Act"). 42 U.S.C. §§ 416(i), 423(d) and 1382(c). The parties

have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28

U.S.C. § 636(c). For the reasons set forth below, Miller's motion for summary judgment

[9] is granted, the Commissioner's cross-motion for summary judgment [16] is denied,

and the case is remanded to the ALJ for further consideration.

**I. BACKGROUND**

**A. Procedural History**

Miller filed her applications for SSI and DIB on December 27, 2011. (R. 157-69.)

In her applications, Miller alleges she has been disabled since January 15, 2010 due to

Post Traumatic Stress Disorder ("PTSD"), anxiety, postpartum depression, auditory and

visual hallucinations, and Attention Deficit Hyperactivity Disorder ("ADHD"). (R. 171.)

1

Her applications were initially denied on March 22, 2012, and again on September 21, 2012, after a timely request for reconsideration. (R. 92-104.) Claimant filed a request for a hearing before an ALJ. (R. 109-10.) On July 18, 2013, ALJ Jose Anglada held a hearing, and on July 26, 2013, the ALJ issued a decision denying claimant's applications for benefits. (R. 15-35.) Miller then requested review by the Appeals Council, which was denied. (R.1-6.) At this point, the ALJ's decision became the final decision of the Commissioner and Miller then filed this action in the District Court.

B. **Medical Evidence**

**1. Treating Physicians**

On July 24, 2009, Dr. Romero Mercado, a primary care physician, diagnosed claimant with asthma, depression, and anxiety. (R. 253-57.) In October of 2010, Dr. Milagranos Villalobos, another primary care physician, also diagnosed claimant with asthma, depression, and anxiety. (R. 265-67.) To manage her depression and anxiety, Dr. Villalobos prescribed Fluoxetine. (R. 267.)

On February 14, 2011, Amanda Lenvin, a mental health counselor, conducted a psychosocial assessment of Miller. (R. 342-59.) During this assessment, Miller stated that for the past two years, her ADHD has caused her to have trouble focusing and finishing tasks, she noted that her emotions are difficult to control and she experienced anxiety and fear of failure. (R. 345.) Miller's thought-process and dress were appropriate, but Lenvin noted that her attention was poor and her speech was rapid. (*Id.*) Miller disclosed a history of sexual abuse, domestic violence, and one previous psychiatric hospitalization after a suicide attempt. (R. 344-61). She also disclosed that she experienced visual hallucinations at night. (R. 347.) Lenvin conducted a Global

Assessment of Functioning Test ("GAF test"), and claimant scored a 62. (R. 344.) Lenvin also diagnosed claimant with Bipolar Disorder Type I. (R. 344.) For further psychiatric evaluation, Lenvin referred claimant to Dr. S.J. Puszkarski. (R. 357.)

On April 27, 2011, Dr. Puszkarski saw claimant for the first time and diagnosed her with ADHD, Inattentive Type and PTSD, for which he prescribed Adderall. (R. 370-71.) Dr. Puszkarski administered a GAF test and claimant scored a 55. (R. 371.) He opined that she had "signs of attentional problems," she was "easily distracted and inattentive," and she was careless and forgetful. (R. 370.) He noted she had difficultly concentrating, she had recurrent distressing dreams about her past abuse, and she suffered from "intense psychological distress at exposure to...cues...that symbolize or resemble the event." (*Id.*) He also noted "markedly diminished interest or participation...in significant activities," "a restricted range of affect" and "irritability or outbursts of anger." (*Id.*) Miller's speech was normal, her thought-process was logical and goal-directed and her insight and judgment were good. (R. 370-71.)

On June 6, 2011, claimant met with Dr. Puszkarski again and no additional symptoms were noted. (R. 368.) He noted that Miller was experiencing feelings of anxiety but there were no depressive symptoms, hallucinations, delusions or other symptoms of psychotic process, and she denied any thoughts of suicide. (*Id.*) Again, her insight and judgment were good, she was dressed appropriately and her mood was also appropriate. (*Id.*) On October 25, 2011, however, Dr. Puszkarski reported that Miller had suffered a set back. (R. 366.) She had not been taking her medications and she displayed signs of psychotic process including anxiety, paranoia, and auditory hallucinations. (*Id.*) Dr. Puszkarski noted that claimant was "friendly, fully

communicative, [and] casually groomed." (*Id.*)  He also noted cognitive functioning was in the normal range, and he prescribed Paxil and Risperdal.  (R. 367.)  At this appointment, Miller denied suicidal thoughts.  (*Id.*)

On January 11, 2012, Dr. Puszkarski saw Miller again and he noted that there were signs of improvement and abatement of the symptoms of psychotic process, although she had been admitted to the hospital after a panic attack.  (R. 364.)  She described no hallucinations, delusions or other symptoms of psychotic process.  (*Id.)* She reported no suicidal thoughts or impulses, and her cognitive functioning, anxiety, insight and social judgment were all noted as good.  *(Id.*)

On March 7, 2012, Dr. Puszkarski completed a mental impairment questionnaire for the purpose of assisting in the determination of claimant's Residual Functioning Capacity ("RFC").  (R. 437-39.)  In the questionnaire, Dr. Puszkarski noted a diagnosis of ADHD, PTSD and Bipolar Disorder Type I.  (R. 437.)  He noted that she has mood swings, difficulty thinking or concentrating, social withdrawal, delusions and hallucinations, obsessions, feelings of worthlessness, suicidal ideation, hostility and paranoia, among other things.  (*Id.*)  In response to a question about clinical findings to support the severity of her mental impairments, he only responded that she "is unable to work, she is isolative [and] unmotivated."  (*Id.*)  He stated she does not have a low I.Q. or reduced intellectual functioning, but he described claimant as not having the ability to: maintain attention for a two-hour segment, maintain regular attendance and be punctual, perform at a consistent pace without unreasonable number and length of rest periods, respond appropriately to changes in a routine work setting, or deal with normal work stress.  (R. 438.)  In support of these findings, Dr. Puszkarski stated only that "due

to her medical conditions, she is unable to work." (*Id.*)  He did find that she was "good" at understanding and remembering simple instructions, working in coordination with others, asking simple questions and requesting assistance, and being aware of normal hazards and taking appropriate precautions.  (*Id.*)  He noted that Miller's ability was "fair" with respect to remembering work-like procedures, carrying out simple instructions, sustaining ordinary routine without special supervision, making simple work-related decisions, completing a normal work day without interruption, accepting instructions and responding appropriately to supervisors, and getting along with co-workers or peers.  (*Id.*)  Lastly, he determined that she had a "slight" restriction of activities of daily living, a "moderate" difficulty in maintaining social functioning, "constant deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner," and "continual" episodes of deterioration or decompensation in work or work-like settings that cause her to withdraw or to experience exacerbation of signs or symptoms.  (R. 439.)

Beginning on May 22, 2012, claimant was examined by Dr. Deep Buch for her Bipolar Disorder and PTSD.  (R. 471-72.)  At the initial consultation, claimant reported mood swings, insomnia, depressive moods, suicide attempts, and issues with self-esteem, among other things.  (*Id.*)  On June 12, 2012, Dr. Buch noted a logical thought process, and a sad, angry, guarded and suspicious disposition.  (R. 473.)  Miller reported that she experienced hallucinations and suicidal thoughts.  (R. 474.)  Dr. Buch noted that she also had symptoms of severe depression.  (*Id.*)

On July 10, 2012, Dr. Buch followed up with claimant.  (R. 577.)  Dr. Buch and his staff created a detailed treatment plan of counseling and prescriptions for Paxil,

Risperdal, and Ativan. (*Id.*) On September 17, 2012, Dr. Buch met with claimant and noticed "much improvement" in her symptoms. (R. 612.) Claimant saw Dr. Buch again on October 15, 2012 and November 12, 2012, and Miller reported that she felt more calm, that she was sleeping better and that she was doing some light exercise daily. (R. 613.) On December 10, 2012, claimant saw Dr. Buch and reported a recent incident, in which her daughter's friend's boyfriend came into their house and beat her. (R. 615.) As a result, claimant reported increased anxiety and paranoia, although she had been doing very well prior to the incident. (*Id.*) Claimant continued with her original treatment plan after this episode. (R. 578-81.)

On March 4, 2013, Miller was examined by Dr. Carol Lynn Childers. (R. 618-19.) Miller reported to Dr. Childers that she was a victim of child abuse and sexual abuse as a child and that she had tried to kill herself multiple times. (R. 618.) Miller also reported that she has a daughter who was the product of rape. (*Id.*) Miller told Dr. Childers that she was sexually harassed at one of her jobs, which had triggered her PTSD. (*Id.*) Dr. Childers noted that Miller felt hopeless and depressed and she experienced paranoia and audio and visual hallucinations. (*Id.*) Dr. Childers diagnosed Miller with PTSD and psychotic disorder. (R. 619.)

Dr. Childers saw claimant again on April 30, 2013. (R. 616.) During this visit, claimant disclosed to Dr. Childers that she had been diagnosed with a brain tumor after she suffered a seizure at age twelve, and she had suffered another seizure while giving birth to her daughter. (*Id.*) At this appointment, Miller reported that she takes her medications regularly or she hears voices and see visions. (*Id.*) She described her issues with self-image and body image since she was raped. *(Id.)* She indicated that

she had gained 120 pounds in the 20 years since her rape in order to protect herself from advances from men.  (*Id.*)  Miller had no suicidal ideation, but persistent hallucinations, in which voices call her insulting names.  *(Id.*)

Claimant next saw Dr. Childers on May 28, 2013, and Dr. Childers reported that claimant was still hearing voices and experiencing severe symptoms of anxiety brought on by her PTSD.  (R. 610-11.)  She is afraid to walk her child to school because she fears people are saying things to her.  (*Id.*)  Miller also reported that she has focus and memory problems because of her auditory hallucinations and paranoid ideation.  (*Id.*)  She reported that she has almost gotten into fights with others because of the paranoia and the voices in her head.  *(Id.*)

On June 19, 2013, Dr. Childers completed a mental impairment questionnaire to assist in the determination of claimant's RFC.  (R. 627-29.)  In the questionnaire, Dr. Childers reported that claimant has auditory hallucinations condemning and humiliating her, and telling her to act out violently.  (*Id.*)  She also experiences extreme paranoia and delusions, feelings of worthlessness, irrational fears, mood disturbances, and she is hostile and irritable.  (*Id.*)  Dr. Childers noted that claimant's diagnosis would cause her to miss work more than three times per month, and that she would be unable to work without substantial interruptions brought on by her psychotic disorder and PTSD.  (*Id.*)  She also noted that claimant is afraid to leave her home and she would be unsafe in a work place. (*Id.*)  Dr. Childers opined that claimant had marked limitations in most of the categories of mental abilities needed to do unskilled work.  (*Id.*)  She noted that Miller was "severely impaired due to the intrusiveness of her psychotic disorder and PTSD." (*Id.*)

Finally, Ms. Sarah Schroeder-Lebec, a counselor at the Circle Family Healthcare Network, submitted a note to the ALJ stating that claimant was incapable of working due to her disabilities. (R. 630.) Ms. Schroeder-Lebec stated that claimant had been diagnosed with bipolar disorder and PTSD. (*Id.*) She opined that claimant suffered from "auditory hallucinations, paranoia, bouts of extreme depression, mood swings, flashbacks, intense anxiety, irrational fears, racing thoughts, impaired concentration, panic attacks, sleep disruption, [and] hyper vigilance." (*Id.*) Ms. Schroeder-Lebec concluded that these symptoms made it impossible for claimant to work. (*Id.*)

### 2. Agency Consultants

On March 15, 2012, Dr. Michael Cremerius completed a review of claimant's medical history and an RFC assessment. (R. 440-56.) Dr. Cremerius found that claimant had been diagnosed with ADHD, Postpartum Depression, and PTSD/Anxiety Disorder. (*Id.*) Dr. Cremerius also found that claimant was only moderately limited in maintaining social functioning and maintaining concentration, persistence, or pace during work. (*Id.*) Dr. Cremerius based his determinations on his observation that claimant was only partially credible and the symptoms she had claimed were not wholly consistent with the notes of her treating physician, Dr. Villalobos. (*Id.*) Based on this evaluation, Dr. Cremerius opined that Miller had the capacity to understand, remember and carry out at least simple one or two step tasks. (*Id.*) Dr. Cremerius also found that claimant's ability to relate to others would be reduced as a result of her PTSD and she would be limited to brief or superficial interactions with co-workers and supervisors. (*Id.*)

On March 20, 2015, Dr. George Andrews conducted a physical RFC assessment based on claimant's medical records, and he diagnosed her with asthma and obesity.

(R. 458-65.)  Dr. Andrews found that claimant could occasionally lift a maximum of fifty pounds, could frequently lift weights of twenty-five pounds or less, could stand or walk with normal breaks for about six hours in an eight-hour workday, could sit for about six hours in an eight-hour workday, and could not use ladders, ropes, scaffolds or heavy machinery due to her history of seizures.  (*Id.*)

On September 17, 2012, Dr. Donald Hensen conducted another psychiatric review of claimant's medical records and completed a mental RFC assessment.  (R. 480-97.)  Dr. Hensen found that the record indicated that claimant had bipolar disorder, depression,  PTSD, and anxiety disorder.  (*Id.*)  In addition to the evidence that Dr. Cremerius had considered, Dr. Hensen reviewed the treatment notes and other records from Dr. Puszkarski and Dr. Childers.  (*Id.*)  Dr. Hensen found this evidence to be generally credible.  (*Id.*)  Based on this information, Dr. Hensen found that claimant had moderate restrictions in activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace at work.  (*Id.*)  Dr. Hensen's assessment also noted that claimant would be moderately limited in her ability to carry out detailed instructions, her ability to maintain attention and concentration for extended periods, her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  (*Id.*)  However, Dr. Hensen also found that Miller could perform a number of basic chores and activities and that she possesses sufficient cognitive abilities to perform simple routine tasks.  (*Id.*)

### C. Claimant's Testimony

Millert testified at the hearing before the ALJ.  (R. 40-75.)  She was 38 years old at the time.  (R. 40.)  She is divorced and has two children, ages 19 and 6.  (R. 43-44.)

She completed the ninth grade before dropping out of school. (R. 43.) After dropping out, she ran away from home, she was homeless for a while and then she was in and out of mental homes. (R. 44, 47.) She was physically abused by her mother as a child, and her father's friend molested her when she was 8 years old. (R. 45.)

Claimant testified that she worked as a sales staff member at a department store for about two years until she was fired for stealing. (R. 47-49.) She then worked as a window teller at a "Payday Loan Store" entering data and interacting with customers until she was fired for an altercation with a co-worker who she claims sexually harassed her. (R. 49-53.) She then briefly started her own moving company before working at a freight company doing data-entry for three years until she was terminated. (R. 53-57.)

Miller stated that in June of 2006 she was sexually and physically assaulted and began experiencing severe anxiety and flashbacks a number of years later when she worked for the freight company. (R. 56-57.) The work environment brought these symptoms on because there were so many men at her office who reminded her of the attack. (R. 56.) She has undergone psychiatric treatment and she takes Risperidone, but the medication only reduces her symptoms by fifty to sixty percent. (R. 61-62.) She testified that she has not been employed since she left the freight company and that her family, friends and 19-year-old-daughter pay her rent. (R. 57-59.)

Claimant testified that when she experiences anxiety and flashbacks, she hears voices telling her to hurt herself and others. (R. 61-62.) Claimant also testified that she hears these voices everyday and that they are oscillating in nature, and usually last a few minutes. (R. 73-74.) She stated that leaving her home causes the auditory hallucinations and feelings of paranoia to intensify. (*Id.*) She has made an effort to

ignore the voices, but she often acts out violently towards herself and others. (*Id.*) She cut herself with a knife seven months prior to the hearing because she wanted to kill herself after a flashback of the rape. (R. 59.) In another episode, she verbally and physically assaulted a patron at a corner store causing her to be permanently banned from the store. (R. 61-62.) Claimant also testified that her psychiatric symptoms have made it difficult for her to care for herself; she decided to gain substantial weight in order to appear unattractive to men, and she has not been able to visit her gynecologist. (R. 56-61). She is being treated by a psychiatrist, Dr. Childers, once a month and she sees a therapist weekly. (R. 60-61.) She has been hospitalized twice within the last two years for her anxiety attacks. (R. 63.) At those times, it felt like she was having a heart attack, she was experiencing paranoid thoughts and she could not move. (*Id.*)

Claimant stated that she is the primary caregiver for her 6-year-old-daughter but her 19-year-old daughter also provides care for her younger sister. (R. 66.) Her 6-year-old daughter, who is autistic, is regularly late for school as a result of Miller's failure to get out of bed in time. (R. 64-67.) Claimant testified that she is able to cook simple meals for herself and her daughters. (R. 67.) She is unable to go to the grocery store without assistance from her older daughter or neighbor because she hears voices when she is in public. (R. 68.) When she is at home, claimant testified that she likes to watch TV, read and listen to music. (R. 69.)

### D. Vocational Expert's Testimony

Vocational Expert Pamela Tucker ("the VE") also testified at the hearing. (R. 76-83.) The ALJ asked the VE to classify claimant's past work experience. (R. 76-77.) The VE testified that claimant worked as a sales clerk, which is classified as light, semi-

skilled work in the Directory of Occupational Titles ("DOT"). (*Id.*) She classified Miller's work as loan clerk as sedentary, semi-skilled work, and her work as an office clerk as light, semi-skilled work. (R. 77-78.)

The ALJ asked the VE to assume the following hypothetical person: an individual with claimant's age, education and work experience who (1) would be limited to lifting no more than fifty pounds occasionally and twenty-five pounds frequently; (2) can only be on their feet standing or walking about six hours in an eight-hour work-day with normal rest periods and sit six hours with normal rest periods; (3) is unable to work at heights or climb ladders; (4) should avoid concentrated exposure to fumes, dust, odors, gases, or poorly ventilated areas; (5) is unable to understand and perform detailed and complex job tasks; (6) is unable to remain focused for long periods of time; (7) can only have casual interactions with the general public and coworkers; and (8) would occasionally be unable to accept instructions and respond appropriately to criticism from supervisors. (R. 78.) The VE opined that this hypothetical person would not be able to perform claimant's past jobs. (R. 78-79.) The VE testified that this person would be able to work as a labeler, a mail clerk, or a small-parts assembler. (*Id.*) She explained that there are approximately 2,300 available positions as a labeler, 2,000 positions as a mail clerk, and 3,200 available positions as a small-parts assembler. (*Id.*)

The VE also testified that the hypothetical individual would need to be on task about eighty-five-percent of the time and could be absent no more than once per month in order to retain employment in any of the positions that were mentioned. (R. 80.) She stated that if the individual could not accept criticism or if they responded to criticism with an outburst, they would not be able to maintain employment. (R. 82-83.)

## II. LEGAL ANALYSIS

### A. Standard of Review

When reviewing an ALJ's denial of benefits, this Court's inquiry is limited to whether there is substantial evidence to support the findings of the ALJ and whether the correct legal standards have been applied. 42 U.S.C. § 405(g); *Bates v. Colvin*, 736 F.3d 1093, 1097 (7th Cir. 2013). Substantial evidence is more than a scintilla of relevant evidence, such that "a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1098 (*quoting Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). Although this Court will not "re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner's," we must undertake a critical review of the evidence. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (*quoting Lopez v. Bernhardt*, 336 F.3d 535, 539 (7th Cir. 2003)).

To avoid reversal, "the ALJ is not required to provide a complete and written evaluation of every piece of testimony and evidence, but [he] must build a logical bridge from the evidence to his conclusion." *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015) (internal quotations omitted). In building this logical bridge between the facts and his conclusion, the ALJ "may not ignore entire lines of contrary evidence." *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012).

### B. Analysis Under the Social Security Act

In order to obtain disability benefits, a claimant must be "disabled" as that term is defined in the Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less

than twelve months." 42 U.S.C. § 423(d)(1)(A). Evaluation of a claimant's disability status requires the application of the following five-step inquiry: (1) whether the claimant is currently unemployed, 20 C.F.R. § 404.1520(b), (2) whether the claimant has a severe impairment, 20 C.F.R. § 404.1520(c), (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App. I., (4) if the claimant does not have a conclusively disabling impairment, whether she or he can perform past relevant work, 20 C.F.R. §404.1520(e), and (5) whether the claimant is capable of performing any work in the national economy. 20 C.F.R. § 404.1520(f). The claimant has the burden of establishing a basis for a disability determination in steps one through four. *Zurawski*, 245 F.3d at 886. If the claimant reaches step five, the burden shifts and the Commissioner must show that the claimant could perform other work available in significant quantities in the national economy. *Id.* at 886.

Here, the ALJ followed this five-step analysis. At step one, the ALJ found that claimant had not engaged in substantial gainful activity since her alleged onset of disability. (R. 17.) At step two, the ALJ found that claimant had the following severe impairments: affective disorder, anxiety disorder, asthma, and obesity. (R. 17.) At step three, the ALJ found that claimant's severe impairments did not meet or medically equal the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I. (R. 18.) At step four, the ALJ found that claimant has the RFC to perform medium work, as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(e), that does not require her to work heights or climb ladders. (R. 19.) The ALJ also found that claimant would need to avoid frequent use of stairs and that she would be unable to understand, remember,

and carry out complex job tasks. (R. 20.) The ALJ further noted that claimant would only be able to have casual interaction with the general public and that she might occasionally be unable to accept instructions and respond to work-related criticism by a supervisor appropriately. (*Id.*) As a result, the ALJ found that Miller is unable to perform any past relevant work. (R. 27.) Then, at step five, the ALJ found that considering her age, education, work experience, and RFC, she would be able to perform jobs that exist in significant numbers in the national economy. (*Id.*) Ultimately, the ALJ found that claimant was not disabled, as defined in the Act. (R. 28).

Claimant now argues that the ALJ improperly disregarded the opinions of her treating physicians and Dr. Henson with regard to her mental impairments, and that he improperly gave controlling weight to Dr. Cremerius' opinions in determining her RFC. Claimant also argues that the ALJ erred in assessing her credibility and improperly relied on the VE's testimony. We address claimant's arguments below.

### C. The ALJ Did Not Build An Accurate And Logical Bridge Between the Medical Evidence And The RFC Determination.

When determining an individual's RFC, an ALJ is required to consider all relevant medical opinions in the administrative record. *See* 20 C.F.R. §§ 404.1527(b) and (c); *see also Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). A treating physician's opinion is entitled to controlling weight if it is well supported by the evidence in the record. 20 C.F.R. § 404.1527(c)(2). While the ALJ is ultimately not required to afford treating physicians' opinions controlling weight, he or she must adequately articulate a logical explanation for their decision to reject them. *See Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013).

In addition, when evaluating the opinion evidence of a treating physician, the ALJ must consider the following: (1) the frequency and length of treatment; (2) the physician's specialty; (3) the diagnostic tests performed; and (4) the consistency with the objective medical evidence and record as a whole.  20 C.F.R. § 404.1527(c)(2).  "An ALJ… may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding."  *Goble v. Astrue*, 385 F. App'x 588, 593 (7th Cir. 2010) (*citing Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009)).  Moreover, an ALJ is not permitted to substitute his or her own judgment for that of a treating physician. *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014).

In determining Miller's RFC, the ALJ gave little weight to Dr. Puszkarski's RFC assessment.  In that assessment, Dr. Puszkarski opined that Miller was unable to work as a result of her disability.  The ALJ rejected this finding because he did not find the objective medical evidence in the record sufficient to support this determination.  The ALJ also noted that Dr. Puszkarski did not indicate length of treatment in his assessment, and the ALJ stated that Dr. Puszkarski could not determine that Miller was unable to work because that determination is ultimately reserved for the Commissioner. (R. 23.)  Similarly, the ALJ gave little weight to the opinion of Dr. Childers.  With respect to her opinion, the ALJ stated that her opinion was not supported by the evidence in the record.  Miller now argues that because Dr. Puszkarski and Dr. Childers were both treating physicians, the ALJ did not adequately articulate his reasons for disregarding their opinions and that this failure requires remand.

We will first address Dr. Puszkarski.  In his mental impairment questionnaire, he checked off many symptoms for Miller, including delusions and hallucinations, suicidal

ideation, feelings of worthlessness, paranoia, and obsessions. However, in the notes from the three visits claimant had with Dr. Puszkarski, he did not note that these symptoms were problematic. Instead, on June 6, 2011, Dr. Puszkarski noted that claimant had no depressive symptoms, and no hallucinations, delusions or other symptoms of psychotic process or suicidal ideation. On January 11, 2012, Dr. Puszkarski noted the same - no hallucinations or delusions and no thoughts of suicide. On October 25, 2011, Dr. Puszkarski did note that claimant had suffered a set back and she was experiencing hallucinations and paranoia, but he explained that this was because she had stopped taking her medication. Once she was back on her medication, there were signs of improvement and abatement of the symptoms of psychotic process, and her hallucinations and paranoia were no longer an issue. Therefore, we agree with the ALJ that the findings in the Dr. Puszkarski's mental impairment questionnaire are not supported by his treatment notes. The only support Dr. Puszkarski listed for the findings in the questionnaire was that claimant was "isolated and unmotivated," with no reference to the treatment notes. In his opinion, the ALJ articulated this discrepancy between the treatment notes and the findings in the questionnaire. As a result, we find that it was appropriate for the ALJ to disregard Dr. Puszkarski's conclusion that Miller was not able to work. *Wurst v. Astrue,* 866 F. Supp. 2d 951, 963 (N.D. Ill. 2012) (ALJ was correct to give treating physician's opinion minimal weight where that opinion was inconsistent with the physician's treatment notes). Therefore, remand on these grounds is not warranted.

With respect to Dr. Childers, however, we agree with Miller that the ALJ's discussion in support of his decision to disregard her opinion was lacking. The ALJ

summarily rejected Dr. Childers' findings by stating that "[Dr. Childers] recommended limitations that were not incorporated into the claimant's RFC, as they were too restrictive and not consistent with the medical records or progress notes." (R. 24.) In support of this decision, the ALJ only stated that "Dr. Childers wrote that the claimant experienced a continual period of decompensation, which is not supported in the record." We agree with Miller that the ALJ's analysis here was deficient. Indeed, Dr. Childers' finding regarding continual periods of decompensation was supported by the record - Dr. Puszkarski made the very same finding in his RFC assessment. (R. 439.) Therefore, the ALJ's statement regarding decompensation was incorrect.

In addition, unlike Dr. Puszkarski's RFC assessment, the findings that Dr. Childers made in her mental impairment assessment were adequately supported by her treatment notes. Throughout her visits with claimant, Dr. Childers noted Miller's paranoia, her debilitating hallucinations, her inability to engage with others because of the voices she heard, and her PTSD. (R. 610-11, 618-19.) The ALJ did not discuss any of this in his decision; instead, he only highlighted those portions of Dr. Childers' records that supported his ultimate decision, while ignoring those notes that supported a finding of disability. *See Bates,* 736 F.3d at 1100 (remanding where the ALJ highlighted all positive treatment notes, but ignored those notes that revealed a claimant struggling with serious mental health issues); *Goble v. Astrue,* 385 Fed.Appx. 588, 593 (7th Cir. 2010) ("an ALJ is obligated to consider all relevant medical evidence and may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding"); *Moore v. Colvin,* 743 F.3d 1118, 1123 (7th Cir. 2014) ("The ALJ must confront the evidence that does not support her conclusion and explain why that

evidence was rejected"). As a result, we find that the ALJ improperly summarily disregarded Dr. Childers' mental health assessment as inconsistent with the medical records. *Czarnecki v. Colvin*, 595 Fed.Appx. 635, 643-44 (7th Cir. 2016) (remanding where the ALJ failed to provide specific treatment notes that contradicted with treating physician's opinion). Without a more adequate discussion of the relevant factors to support his decision to disregard Dr. Childers' opinion, we find that the ALJ has failed to build the logical bridge from his reasoning to his ultimate decision, and as a result, we find that remand is appropriate. *Olson v. Colvin,* 13-cv-5384, 2015 WL 273394, at *9 (N.D. Ill. Jan. 20, 2015) (remanding where the ALJ disregarded the treating physician's opinion, and incorrectly stated that the physician's opinion was not supported by the treatment notes).

Miller also argues that the ALJ did not adequately explain his decision to give the opinions of the state agency physician Dr. Cremerius more weight than the treating physicians in determining the RFC. She argues that the ALJ simply stated that Dr. Cremerius' opinion was most consistent with the record. (R. 27.) Because we have already determined that the ALJ's RFC determination and the weight given to the various physicians was not adequately articulated, we do not need to determine whether we agree with claimant's argument here. Instead, on remand, the ALJ is directed to adequately articulate his reasons for giving more weight to Dr. Cremerius's opinion.

### C. The ALJ's Decision on Claimant's Credibility Was Not Adequate

Next, Miller argues that the ALJ's credibility analysis was flawed. Because the ALJ is in the best position to determine the credibility of witnesses, we review that

determination deferentially. *Craft v. Astrue,* 539 F.3d 668, 676 (7th Cir. 2008). The

Court will not overturn an ALJ's credibility determination unless it is patently wrong, or

lacking "any explanation or support." *Elder v. Astrue,* 529 F.2d 408, 413-14 (7th Cir.

2008). The ALJ's credibility determination "must contain specific reasons for the finding

on credibility, supported by the evidence in the case record, and must be sufficiently

specific to make clear to the individual and to any subsequent reviewers the weight the

adjudicator gave to the individual's statements and the reasons for that weight." *Olson*

*v. Colvin,* 13-cv-5384, 2015 WL 273394, at *9 (N.D. Ill. Jan. 20, 2015).

Moreover, in evaluating the credibility of claimant's subjective complaints, an ALJ

is required to consider: (1) claimant's daily activities; (2) the location, duration,

frequency, and intensity of the symptoms; (3) factors that precipitate or aggravate the

symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the

claimant takes to alleviate pain or other symptoms; (5) treatment, other than medication,

the claimant receives or has received for relief of symptoms; (6) any measure other than

treatment claimant uses or has used; and (7) any other factors concerning the

claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§

404.1529 & 416.929. An ALJ "may not disregard subjective complaints merely because

they are not fully supported by objective medical evidence." *Knight v. Chater*, 55 F.3d

309, 314 (7th Cir. 1995).

Here, the ALJ found that claimant was not "wholly credible" due to

inconsistencies in her testimony regarding her ability to carry out activities of daily living,

her education, her reported symptoms, her use of alcohol, her work history, and her

treatment history. (R. 25-26.) The ALJ also found that she testified that her symptoms

were improved with her medications and ongoing treatment. (R. 26.)  Claimant argues

that the ALJ was wrong to rely on her activities of daily living to find that her testimony

was not credible.  Miller is correct that the Seventh Circuit has warned courts to be wary

of this type of argument because the fact that a claimant can participate in activities of

daily living does not necessarily mean that they can take on full-time employment.  *See*

*Bjornson*, 671 F.3d at 647 ("The critical difference between activities of daily living and

activities in a full-time job are that a person has more flexibility in scheduling the former

than the latter, can get help from other persons… and is not held to a minimum

standard of performance, as she would be by an employer.").  The Seventh Circuit has

also warned that in cases of mental impairments, while there may be some periods of

improvement, this also leads to fluctuating levels of functional capacity.  See, e.g.,

*Punzio v. Astrue*, 630 F.3d 704, 710–11 (7th Cir. 2011); *Fuchs v. Astrue*, 873 F.Supp.2d

959, 971 (N.D.Ill. 2012) ("Mental illnesses are episodic by nature," and "characterized

by good days and bad days...").

Regardless, in this case, because we have already determined that claimant is

entitled to remand, the ALJ should address the issue of claimant's credibility with

reference to sufficient evidence to build the logical bridge from the reasoning to his final

determination.  This means that purported inconsistencies should be adequately

articulated so that the reasons for his adverse credibility determination are clear to a

reviewing court.  *Goble,* 385 Fed. Appx. at 591 ("an ALJ should compare the

consistency of a claimant's statements against objective information in the medical

record.").

Finally, Miller argues that the ALJ erred in his reliance on the testimony of the VE at the hearing.  Because this case will be remanded, we need not address this last argument since the ALJ's hypothetical questions to the VE are likely to change on remand.

### III. Conclusion

For the reasons set forth above, Miller's motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied.  This matter is remanded to the Social Security Administration for proceedings consistent with this Opinion.  It is so ordered.

**Dated March 6, 2017**

**The Honorable Michael T. Mason**